# EXHIBIT 2

**WARREN TERZIAN LLP**
Thomas D. Warren (CA 160921)
tom.warren@warrenterzian.com
Dan Terzian (CA 283835)
dan.terzian@warrenterzian.com
Erick K. Kuylman (CA 313202)
erick.kuylman@warrenterzian.com
222 N Pacific Coast Hwy, Ste 2000
El Segundo, CA 90245-5614
Telephone: (213) 410-2620

*Attorneys for Plaintiff
and Proposed Class Counsel*

Electronically FILED by
Superior Court of California,
County of Los Angeles
4/15/2025 5:08 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By J. Covarrubias, Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| CHRISTINA ROBINS, on behalf of herself, all others similarly situated, and the general public,<br><br>Plaintiff,<br><br>vs.<br><br>LEMME INC., a Delaware corporation; and JOHN DOES 1–10,<br><br>Defendants. | Case No. 25STCV11152<br><br>**Class Action Complaint for:**<br><br>1. **Unfair Competition (California Business & Professions Code § 17200 *et seq.*);**<br><br>2. **False Advertising (California Business & Professions Code § 17500 *et seq.*); and**<br><br>3. **Violation of the Yelp Law (Cal. Civ. Code § 1670.8)**<br><br>**DEMAND FOR JURY TRIAL** |

1

COMPLAINT

Plaintiff Christina Robins ("Plaintiff") brings this action, on behalf of herself, all others similarly situated, and the general public, against Lemme Inc., a Delaware corporation, and John Does 1–10 (collectively "Lemme" or "Defendants"), and states:

## I. GENERAL ALLEGATIONS

1.      Glucagon-like peptide-1 (GLP-1) agonists are a class of medications designed to treat type-2 diabetes that have shown themselves to also be extremely effective in helping people lose weight. GLP-1 agonists like semaglutide (Ozempic, Wegovy, Rybelsus) and dual GLP-1/GIP (glucose-dependent insulinotropic polypeptide) agonists like tirzepatide (Mounjaro, Zepbound) have become hugely popular as a result of their effectiveness.

2.      GLP-1 is a hormone made in the small intestine and the nucleus of the solitary tract (a region of the brain) that triggers the release of insulin from the pancreas (lowering blood sugar), blocks the release of glucose into the bloodstream, slows stomach emptying, and increases feelings of satiety.

3.      Yet GLP-1 has a half-life of just 1–2 minutes, as it is quickly degraded by enzymes in the body. As a result, no clinical data supports the notion that simply boosting the amount of naturally occurring GLP-1 in the body has sustained weight loss effects.

4.      What makes GLP-1 agonists so effective is that the amino acid sequence of GLP-1 has been modified to make the agonists resistant to being broken down by the enzymes that break down GLP-1. Semaglutide, for example, has a half-life of about 7 days when administered by injection—which is why people who take Ozempic or Wegovy take weekly injections—as opposed to 1–2 minutes.

5.      Given their effectiveness, the market for GLP-1 agonists has skyrocketed in recent years. The worldwide market in 2024 is estimated to have been more than $25 billion, and the market is estimated to rise to between $50 billion and $133 billion worldwide by 2030.

6.      Yet GLP-1 agonists are very expensive, and for those whose insurance will not cover the drugs, they are often cost-prohibitive.

COMPLAINT

WARREN
TERZIAN LLP

7.      Enter Lemme, a supplement brand founded by Simon Huck and Kourtney Kardashian Barker, hoping to cash in on the GLP-1 agonist craze and swindle Americans into buying their supplements instead.

8.      On their website lemmelive.com, Defendants market and sell "Lemme GLP-1 Daily" capsules to Californians. In truth, they are just extracts of lemon, orange, and saffron.

9.      Defendants claim that clinical studies show that the lemon extract (trademarked "Eriomin") increases the amount of naturally occurring GLP-1 in the body by 17 percent. They call GLP-1 the "un-hunger" hormone and tout the "power of GLP-1" in slowing digestion and managing hunger and claim that their supplement "promote[s] your body's GLP-1 production." "[F]actors like age, lifestyle, and diet can affect your body's ability to produce GLP-1. That's where we come in":



10.      Lemme further claims that "[b]oosting GLP-1 levels in the body" using Lemme GLP-1 Daily "comes with a range of health benefits" including "healthy weight loss":

WARREN
TERZIAN LLP

COMPLAINT

11.    These statements misleadingly claim that supplementing naturally occurring GLP-1 will reduce hunger. Even if the studies upon which Defendants rely were not flawed (among other reasons, they rely on sample sizes that are far too small to derive valid statistical conclusions), Defendants provide no clinical evidence that increasing the amount of GLP-1 in the body by 17 percent has any impact on "un-hunger." "If it were that simple, the pharmaceutical industry wouldn't have spent decades developing stable GLP-1 analogs as the natural form breaks down too fast in the body to be effective."[1]

12.    To the contrary, the studies show that after taking Eriomin for four months, participants failed to show any decrease in body weight, body-mass index (BMI), or waist/hip ratio. To the contrary, the studies show that after taking Eriomin for four months, participants failed to show any decrease in body weight, body-mass index (BMI), or waist/hip ratio. The authors of the 2019 study upon which Defendant relies made this clear in their analyses,

---

[1] Munoz, Nini, and Nirenberg, Edward, "ABCDEFG . . . LEMME Unravel Kourtney Kardashian's Latest Supplement Fad," https://techingitapart.substack.com/p/abcdefg-lemme-unravel-kourtney-kardashians?utm_source=profile&utm_medium=reader2.

WARREN
TERZIAN LLP

reporting that "[s]upplementation with Eriomin (200, 400, and 800 mg/day) and placebo had no effect on body weight, BMI, lean mass, fat mass, fat percentage, and hip waist ratio."[2] The 2022 study similarly reported that "[s]upplementation with Eriomin had no effect on blood pressure (systolic and diastolic), body weight, BMI, lean mass, fat mass, and ratio hip/waist."[3]

13.    The lack of change in body weight, BMI, and waist/hip ratio can be seen in the tables below from the two studies:[4]

Table 5.

Hemodynamic and Anthropometric Parameters of Prediabetic Volunteers Submitted to Eriomin (200 mg/d) or Placebo for 12 Weeks

| Variables | Placebo | | Eriomin | |
|---|---|---|---|---|
| | 0 Week | 12° Week | 0 Week | 12° Week |
| Systolic blood pressure, mmHg | $121 \pm 13$ | $123 \pm 19$ | $102 \pm 25$ | $102 \pm 26$ |
| | | −0.7% | | 0.2% |
| Diastolic blood pressure, mmHg | $76.0 \pm 10.4$ | $77.3 \pm 8.7$ | $76.0 \pm 10.4$ | $75.0 \pm 11.1$ |
| | | 1.8% | | 1.5% |
| Body weight, kg | $99.6 \pm 23.1$ | $98.9 \pm 23.1$ | $102 \pm 25$ | $102 \pm 26$ |
| | | −0.7% | | 0.0% |
| BMI, kg/m$^2$ | $34.5 \pm 6.5$ | $34.5 \pm 6.7$ | $34.5 \pm 7.1$ | $34.5 \pm 7.3$ |
| | | −0.3% | | −0.2% |
| Lean mass, kg | $34.5 \pm 7.3$ | $34.7 \pm 7.4$ | $34.9 \pm 6.7$ | $34.9 \pm 7.3$ |
| | | 0.5% | | 0.2% |
| Fat mass, kg | $37.7 \pm 8.9$ | $38.3 \pm 15.6$ | $40.1 \pm 17.8$ | $39.3 \pm 18.6$ |
| | | −1.6% | | −1.8% |
| Ratio waist/hip | $1.05 \pm 0.10$ | $1.05 \pm 0.09$ | $1.06 \pm 0.08$ | $1.06 \pm 0.09$ |
| | | 0.1% | | 0.6% |

[2] Ribeiro C.B., Ramos F.M., Manthey J.A., Cesar T.B., "Effectiveness of Eriomin in managing hyperglycemia and reversal of prediabetes condition: A double-blind, randomized, controlled study," 7 Phytotherapy Res. 11 (June 11, 2019), 1921–1933.

[3] Cesar T.B., Ramos F.M., & Ribeiro C.B., "Nutraceutical Eriocitrin (Eriomin) Reduces Hyperglycemia by Increasing Glucagon-Like Peptide 1 and Downregulates Systemic Inflammation: A Crossover-Randomized Clinical Trial," 25 J. of Medicinal Food 11 (Nov. 9, 2022), 1050–1058 (emphasis added).

[4] Cesar T.B., Ramos F.M., & Ribeiro C.B., "Nutraceutical Eriocitrin (Eriomin) Reduces Hyperglycemia by Increasing Glucagon-Like Peptide 1 and Downregulates Systemic Inflammation: A Crossover-Randomized Clinical Trial," 25 J. of Medicinal Food 11 (Nov. 9, 2022), 1050–1058 (emphasis added); Ribeiro C.B., Ramos F.M., Manthey J.A., Cesar T.B., "Effectiveness of Eriomin in managing hyperglycemia and reversal of prediabetes condition: A double-blind, randomized, controlled study," 7 Phytotherapy Res. 11 (June 11, 2019), 1921–1933. Several rows of the second table have been removed so it can fit on one page.

Table 5.

Anthropometry and blood pressure of individuals with prediabetic subject to supplementation with 200, 400, or 800 mg/day for 12 weeks

| Variables | Period | Eriomin | | | |
|---|---|---|---|---|---|
| | week | Placebo | 200 | 400 | 800 |
| Body weight (kg) | 0 | 95.3 ± 24.5 | 96.0 ± 22.0 | 95.9 ± 18.8 | 96.0 ± 20.9 |
| | 4 | 95.3 ± 24.6 | 96.0 ± 22.0 | 95.7 ± 19.1 | 96.0 ± 21.6 |
| | 8 | 95.2 ± 24.8 | 96.1 ± 21.7 | 95.8 ± 19.2 | 95.7 ± 21.7 |
| | 12 | 95.5 ± 24.3 | 96.1 ± 22.1 | 95.7 ± 19.1 | 95.8 ± 22.0 |
| | $\delta$ (12–0 week) | 0.2% | 0.1% −0.1% | −0.2% | −0.2% |
| BMI (kg/m$^2$) | 0 | 34.2 ± 7.5 | 34.3 ± 7.1 | 33.9 ± 6.6 | 34.0 ± 7.0 |
| | 4 | 34.4 ± 7.4 | 34.3 ± 7.1 | 33.7 ± 6.8 | 34.0 ± 7.2 |
| | 8 | 34.2 ± 7.6 | 34.3 ± 7.1 | 33.8 ± 6.7 | 33.9 ± 7.2 |
| | 12 | 34.5 ± 6.7 | 34.2 ± 6.2 | 33.7 ± 6.9 | 34.2 ± 7.1 |
| | $\delta$ (12–0 week) | 0.9% | 0.3% 0.3% | −0.6% | 0.6% |
| Lean mass (kg) | 0 | 32.3 ± 6.7 | 32.1 ± 6.2 | 31.8 ± 5.5 | 32.0 ± 6.9 |
| | 4 | 32.2 ± 7.2 | 32.4 ± 6.1 | 32.0 ± 5.8 | 32.0 ± 7.3 |
| | 8 | 31.9 ± 7.2 | 32.2 ± 6.2 | 32.0 ± 5.8 | 31.9 ± 7.3 |
| | 12 | 32.4 ± 7.1 | 32.4 ± 6.4 | 32.0 ± 5.6 | 31.9 ± 7.4 |
| | $\delta$ (12–0 week) | 0.3% | 0.9% 0.4% | 0.6% | −0.3% |
| Fat mass (kg) | 0 | 38.7 ± 15.6 | 38.5 ± 16.8 | 37.8 ± 15.4 | 39.0 ± 14.3 |
| | 4 | 38.8 ± 15.1 | 38.2 ± 17.0 | 37.4 ± 15.6 | 38.8 ± 14.7 |
| | 8 | 38.8 ± 15.1 | 38.5 ± 16.8 | 37.3 ± 15.6 | 38.0 ± 15.2 |
| | 12 | 38.9 ± 15.2 | 38.2 ± 16.9 | 37.3 ± 15.5 | 38.0 ± 15.4 |
| | $\delta$ (12–0 week) | 0.5 | −0.8% −1.6% | −1.3% | −2.6% |
| Body fat (%) | 0 | 39.0 ± 9.3 | 38.9 ± 9.9 | 38.8 ± 10.7 | 39.6 ± 8.8 |
| | 4 | 39.1 ± 8.8 | 38.7 ± 10.2 | 38.7 ± 11.1 | 38.9 ± 9.1 |
| | 8 | 39.6 ± 8.4 | 38.9 ± 10.0 | 38.5 ± 11.2 | 38.8 ± 9.5 |
| | 12 | 39.7 ± 8.5 | 38.5 ± 9.9 | 38.6 ± 10.8 | 38.7 ± 9.7 |
| | $\delta$ (12–0 week) | 1.8% | −1.0% −1.3% | −0.5% | −2.3% |
| Ratio waist/hip | 0 | 1.06 ± 0.15 | 1.05 ± 0.10 | 1.06 ± 0.11 | 1.06 ± 0.17 |
| | 4 | 1.06 ± 0.19 | 1.05 ± 0.10 | 1.05 ± 0.12 | 1.05 ± 0.17 |
| | 8 | 1.06 ± 0.19 | 1.05 ± 0.10 | 1.05 ± 0.12 | 1.05 ± 0.18 |
| | 12 | 1.06 ± 0.12 | 1.05 ± 0.10 | 1.05 ± 0.10 | 1.05 ± 0.12 |
| | $\delta$ (12–0 week) | 0.0% | 0.0% −0.6% | −0.9% | −0.9% |

WARREN TERZIAN LLP

14.	These tables show no change in body weight, BMI, or waist-hip ratio over the 12-week period that was analyzed, regardless of the dose of Eriomin:[5]



15.	The number of calories consumed did not change in the 12-week period either:[6]

Table 6.

Dietary parameters of individuals with prediabetic subject to supplementation with 200, 400, or 800 mg/day for 12 weeks

| Variables | Period | Eriomin | | | |
|---|---|---|---|---|---|
| | Week | Placebo | 200 | 400 | 800 |
| Energy (Kcal) | 0 | 1820 ± 242 | 1879 ± 214 | 1769 ± 174 | 1840 ± 270 |
| | 4 | 1815 ± 264 | 1893 ± 223 | 1771 ± 182 | 1832 ± 257 |
| | 8 | 1817 ± 240 | 1881 ± 229 | 1772 ± 192 | 1840 ± 260 |
| | 12 | 1829 ± 294 | 1873 ± 240 | 1768 ± 184 | 1845 ± 255 |
| | $\delta$ (12–0 week) | 0.7% [†] | −0.3% [†] | −0.05% [†] | 0.2% [†] |
| | | | −0.18% [††] | | |

---

[5] Munoz, Nini, and Nirenberg, Edward, "ABCDEFG . . . LEMME Unravel Kourtney Kardashian's Latest Supplement Fad," https://techingitapart.substack.com/p/abcdefg-lemme-unravel-kourtney-kardashians.

[6] Cesar T.B., Ramos F.M., & Ribeiro C.B., "Nutraceutical Eriocitrin (Eriomin) Reduces Hyperglycemia by Increasing Glucagon-Like Peptide 1 and Downregulates Systemic Inflammation: A Crossover-Randomized Clinical Trial," 25 J. of Medicinal Food 11 (Nov. 9, 2022), 1050–1058.

WARREN
TERZIAN LLP

16.     These results are hardly surprising. The primary mechanism by which GLP-1 levels rise in the body is eating—the release of GLP-1 while eating that helps regulate satiety and slows gastric emptying. The resting concentration of active GLP-1 in the blood is between 5-10 pmol/L (picomoles per liter), which increases to approximately 50 pmol/L after eating, before breaking down.[7] As such, GLP-1 concentration in the blood increases by approximately 400% to 900% after eating. It is unsurprising, therefore, that a mere 17% increase in GLP-1 would have no discernable effect on caloric consumption, BMI, or weight loss.

17.     Comparing Lemme's claims with GLP-1 agonists that actually *do* have an effect on caloric consumption, satiety, and weight loss shows even more starkly the misleading nature of Defendants' claims of weight loss benefits derived from a 17% increase in GLP-1. A 1 mg weekly dose of Ozempic or Wegovy results in a concentration of synthetic GLP-1 (semaglutide) in the blood of approximately 30,000 pmol/L.[8] As the resting concentration of GLP-1 in the blood is 5 to 10 pmol/L, the resting concentration of GLP-1 agonists in the blood is *300,000% to 600,000% greater*—and with a half-life of 7 days instead of 2 minutes, lasts more than 5,000 times longer in the body.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

---

[7] Padidela, Patterson M., Sharief N., Ghatei M., Hussain K., "Elevated basal and post-feed glucagon-like peptide 1 (GLP-1) concentrations in the neonatal period," European J. of Endocrinology 2009 Jan 160:1: 53–58.

[8] Petri, K.C., Ingwersen, S.H., Flint, A., Zacho, J., Overgaard, R.V., "Semaglutide s.c. Once-Weekly in Type 2 Diabetes: A Population Pharmacokinetic Analysis," Diabetes Ther. 2018 Jun 15:9(4):1533–1547.

COMPLAINT

18.    Defendants' misleading claims about Lemme GLP-1 Daily are not just on their website. On Lemme's Instagram page, Lemme cofounder Scott Huck claims that increasing natural GLP-1 with Lemme GLP-1 Daily "promotes fat loss + reduces hunger":



19.    And in an interview posted on Lemme's Instagram page (a portion of which was also posted to Lemme's Facebook page), Huck (with Lemme cofounder Kardashian Barker by his side) trumpeted the supposed effect of Lemme GLP-1 Daily's alleged 17% increase in GLP-1 on weight loss:

9

WARREN
TERZIAN LLP

> Interviewer: What happens if you start taking the GLP-1 Daily, what will your body start to do:
>
> Huck: So, it's three clinically studied ingredients for weight management: so burning visceral fat, and then there's appetite control—so curbing sugar and carb cravings—and *arguably like the most important is it increases GLP-1 hormone naturally in your body without having to take a synthetic drug*. So we know that 70% of people who are taking GLP-1 medications stop after a year because of side effects because they don't want to take a drug, because they're also extremely expensive, and we have spent years getting this right and using ingredients that are really game changing.

20.     Another reason that Defendants' advertisements are misleading is that, while they claim to have clinical support for the components of Lemme GLP-1 Daily, they did not study the combination of those extracts in a single supplement—meaning that the supplement has not been clinically tested. "[W]hile one could argue that research has occurred on these 3 active ingredients individually (ignoring the glaring problems with the quality of that work), no data has been made available regarding the combination of these agents in a single product."[9] This is critical, because compounds may have an effect on other compounds when taken in combination, which is why over-the-counter medicines with multiple active ingredients are not considered to be safe and effective unless "combining of the active ingredients does not decrease the safety or effectiveness of any of the individual active ingredients[.]" 21 C.F.R. § 330.10 (a)(4)(iv).

21.     And how much is this supposed wonder drug whose GLP-1 weight loss effects have apparently eluded scientists, researchers, and multi-billion-dollar pharmaceutical companies for decades? A one-month supply costs $90, and if consumers subscribe, a six-month supply costs $378. Defendants tell consumers to take "[t]wo capsules a day, taken with food, to support your weight management goals," and—of course—the "best results" do not come without "consistent, daily use for at least 3-6 months."

22.     By falsely advertising that consumers purchasing Lemme GLP-1 Daily will see "un-hunger" and weight loss benefits from an alleged increase in GLP-1 levels, Defendants

---

[9] Munoz, Nini, and Nirenberg, Edward, "ABCDEFG . . . LEMME Unravel Kourtney Kardashian's Latest Supplement Fad," https://techingitapart.substack.com/p/abcdefg-lemme-unravel-kourtney-kardashians.

have violated California's unfair competition and false advertising laws. This action seeks restitution for Plaintiff and members of the proposed False Advertising Class for purchasing Lemme GLP-1 Daily capsules from lemmelive.com as well as public injunctive relief to stop Defendants from fleecing Californians in the future.

23.     Not only do Defendants falsely advertise Lemme GLP-1 Daily, they seek to contractually bar their customers from making critical claims about the performance of their supplements.

24.     Because of the current power of the internet and social media platforms to publicize a company's offerings of goods or services—and the potential harm to corporate interests from negative consumer statements, companies have a significant incentive to minimize the negative publicity they receive. Some companies have gone as far as to attempt to prohibit customers and potential customers from restricting their ability to criticize the goods or services they offer, to the detriment of consumers, potential consumers, and the public of the State of California.

25.     Section 1670.8 of the California Civil Code, otherwise known as the "Yelp Law," was enacted to protect the right of California consumers to voice their opinions, observations, and experiences about the products and services delivered or offered to California consumers. The California Legislature determined that such freedom is important to keep the public informed and keep large corporations honest about the quality of the goods or services they offer to consumers.

26.     Section 1670.8(a) provides that a "contract or proposed contract for the sale or lease of consumer goods or services may not include a provision waiving the consumer's right to make any statement regarding the seller or lessor or its employees or agents, or concerning the goods or services[.]" The statute further provides that "any waiver of the provisions of this section is contrary to public policy, and is void and unenforceable." Cal. Civ. Code § 1670.8(a).

27.     When California consumers purchase supplements from lemmelive.com, Defendants attempt to bind or bind them to contractual terms set forth in "terms of service":

11

WARREN
TERZIAN LLP



28.     The terms of service provisions are part of a contract or proposed contract under section 1670.8(a). Among the terms of the contract or proposed contract are that purchasers may not post negative performance reviews of GLP-1 Daily (or other Lemme supplements) on Defendants' website: "Anything you post, upload, share, store, or otherwise provide or make available through the Services is your 'User Submission'. . . . You agree that you will not post, upload, share, store, or otherwise provide through the Services any User Submissions that . . . (ix) is [sic] a performance claim about any Lemme Products."

29.     These terms violate the Yelp Law, in that they aim to restrict the rights of consumers to make claims critical of the performance of Defendants' products.

## II.   Jurisdiction and Venue

30.     This Court has jurisdiction over this action under Cal. Code Civ. Proc. § 410.10, Cal. Bus. & Prof. Code §§ 17203–17204, 17604, and Cal. Code Civ. Proc. § 382.

31.     This Court has personal jurisdiction over Defendants. Events giving rise to the cause of action, as well as injury to Plaintiff, occurred in California as a result of Defendants'

WARREN
TERZIAN LLP

conduct directed toward California consumers. Defendants also shipped their products to the State of California.

32.    Venue is proper in this Court under Cal. Code Civ. Proc. § 395(a) because Lemme Inc. is an out-of-state corporation that has no designated place of business in California.

33.    Removal of this case to federal court would be improper. Because Plaintiff brings her claims for public injunctive relief to protect future potential California customers of Defendants and does not allege that she faces an actual or imminent threat of injury, Plaintiff lacks Article III standing to assert those claims. Because Plaintiff does not allege that she lacks an adequate remedy at law with respect to her claims for restitution, there is no federal equitable jurisdiction over those claims. Plaintiff also lacks Article III standing to assert her claim under Cal. Civ. Code § 1670.8(a). *See Masry v. Lowe's Companies, Inc.,* No. 24-CV-00750-CRB, 2024 WL 4730423, at *1 (N.D. Cal. Nov. 7, 2024); *Anderson v. United Parcel Serv. of Am., Inc.*, No. 2:24-cv-00096-DSF-SSC, 2024 WL 4492042, at *3–7 (C.D. Cal. Oct. 15, 2024); *Shahbaz v. Arista Networks, Inc.*, No. 2:24-CV-00431-DAD-SCR, 2024 WL 4368253, at *4 (E.D. Cal. Oct. 1, 2024); *O'Donnell v. Crocs Retail, LLC*, No. 2:24-cv-02726-SVW-PD, 2024 WL 3834704, at *3–5 (C.D. Cal. Aug. 15, 2024).

### III.    Parties

34.    Plaintiff Christina Robins is a resident of the State of California.

35.    Defendant Lemme Inc. is a Delaware corporation that is headquartered in New York City.

36.    Plaintiff does not know the names of the defendants sued as John Does 1–10 but will amend this complaint when that information becomes known. Plaintiff alleges on information and belief that each of the Doe defendants is in some manner responsible for the wrongdoing alleged herein, either as a direct participant, a principal, an agent, a successor, an alter ego, a co-conspirator, or an aider-and-abettor with one of the named defendants.

37.    Plaintiff is informed and believes that all times material hereto and mentioned herein, each Defendant sued herein was the agent, servant, employer, joint venturer, partner,

subsidiary, parent, division, alias, alter ego, co-conspirator, and/or aider-and-abettor of the other Defendants. Plaintiff is also informed and believed that, at all times, each Defendant was acting within the purpose and scope of such agency, servitude, employment, ownership, subsidiary, alias, and/or alter ego and with the authority, consent, approval, control, influence, and ratification of each remaining Defendant sued herein.

## IV.   Specific Allegations

38.   Plaintiff first learned about Lemme GLP-1 Daily by watching an interview with Huck on Facebook or Instagram.

39.   After hearing the interview, Plaintiff went to lemmelive.com in September 2024 and read the claims about Lemme GLP-1 Daily's effect on GLP-1 production and weight loss. Based on Defendants' false advertising, Plaintiff purchased a subscription to Lemme GLP-1 Daily.

40.   Plaintiff took Lemme GLP-1 Daily twice daily, as instructed, for more than three months. Had she known that Defendants had no clinical basis to claim any hunger or weight loss benefits from the supplement's claimed increase in naturally occurring GLP-1 levels, she would not have purchased Lemme GLP-1 Daily or would have only been willing to purchase the supplement at a lower price. While on the supplement, she gained 5 pounds.

41.   When Plaintiff purchased Lemme GLP-1 Daily from lemmelive.com, Defendants bound or attempted to bind her to contractual terms set forth in "terms of service." Among the terms of the contract or proposed contract were that Plaintiff could not post negative performance claims about Lemme GLP-1 Daily on Defendants' website.

## V.   Class Allegations

42.   Plaintiff brings this action on behalf of herself and all other similarly situated individuals pursuant to California Code of Civil Procedure § 382 and seeks certification of the following two classes against Defendants:

> All California residents who, within the applicable statute of limitations (the "Class Period"), purchased Lemme GLP-1 Daily (the "False Advertising Class"); and

All California residents who, within the Class Period, purchased Defendants' products from lemmelive.com (the "Yelp Law Class").

43.    Excluded from the Classes are Defendants and their parent companies, subsidiaries, and affiliates, as well as their respective officers, employees, agents, and affiliates. Also excluded from the Classes is any judicial officer who presides over this action.

44.    Plaintiff reserves the right to expand, limit, modify, or amend the class definitions, including adding subclasses, in connection with their motion for class certification or at any other time, based on, inter alia, changing circumstances or new facts obtained during discovery.

45.    The Classes are so numerous that joinder of all members is impracticable. On information and belief, Plaintiff believes that the proposed Classes contains thousands of individuals. The precise number of Class members is unknown to Plaintiff.

46.    Plaintiff's claims are typical of False Advertising Class members because all False Advertising Class members were deceived, or were likely to be deceived, by Defendants' false advertising. Plaintiff is advancing the same claims and legal theories on behalf of herself and all False Advertising Class members.

47.    Plaintiff's claims are typical of Yelp Law Class members because all Yelp Law Class members were subject to the same contract or proposed contract when purchasing Defendants' products. Plaintiff is advancing the same claims and legal theories on behalf of herself and all Yelp Law Class members.

48.    Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no antagonistic or adverse interest to the Classes.

49.    A class action is the superior procedure to vindicate the interests of Plaintiff and the Classes. The amount by which Defendants were unjustly enriched at the expense of individual False Advertising Class members, and the amount of statutory damages of Yelp Law Class members, are relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims. It would thus be virtually impossible for

WARREN
TERZIAN LLP

Plaintiff and the Classes to obtain effective redress through individual actions. Moreover, absent a class action, the rights of Class members and the general public would likely not be vindicated.

50.    This action involves common questions of law and fact that predominate over questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

a.    whether Defendant's marketing, advertising, packaging, labeling, and other promotional materials for Lemme GLP-1 Daily are deceptive and misleading;

b.    whether, during the Class Period, Defendants engaged in unfair, fraudulent, and unlawful business practices under the UCL;

c.    whether, during the Class Period, Defendants engaged in false advertising under the FAL;

d.    whether Class members are entitled to public injunctive relief as a result of Defendants' conduct;

e.    whether False Advertising Class members are entitled to restitution as a result of Defendants' conduct;

f.    whether, during the Class Period, the attempted imposition of Defendants' terms of use on Yelp Law Class members violated Cal. Civ. Code § 1670.8, and, if so, whether the violations were willful, intentional, or reckless;

g.    whether Yelp Law Class members are entitled to civil penalties under Cal. Civ. Code § 1670.8 and the amount of those penalties; and

h.    whether Class members are entitled to recover attorney's fees.

51.    Absent public injunctive relief, California consumers who are potential customers of Defendants are susceptible to future harm from Defendants' conduct.

52.    On information and belief, Defendants keep computerized records of their customers. Defendants have one or more databases through which a significant majority of Class members may be identified and ascertained, and they maintain contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

WARREN
TERZIAN LLP

16

COMPLAINT

## VI.    Causes of Action

### First Cause Of Action

**Unfair Competition, Cal. Bus. & Prof. Code § 17200 et seq. against Defendants**

53.    Plaintiff realleges all of the allegations in prior paragraphs (except paragraphs 23–29).

54.    Plaintiff brings this claim individually, on behalf of the members of the proposed False Advertising Class, and on behalf of the general public against Defendants for violating the UCL.

55.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200. Liability under the UCL attaches when a party engages in unfair, fraudulent, or unlawful practices, regardless of the party's state of mind.

Unfair Business Practices

56.    A business act or practice is unfair under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims.

57.    Defendants' false advertising scheme constitutes an unfair business practice because the scheme misled customers, offended an established public policy of truthfulness in the labeling of drugs and in advertising generally, and constituted immoral, unethical, oppressive, and unscrupulous activity that is substantially injurious to consumers.

58.    The harm to Plaintiff and members of the proposed False Advertising Class outweighs any rationale for Defendants' practices. There were alternative means of furthering Defendants' legitimate business interests other than deceiving their customers.

Fraudulent Business Practices

59.    A business practice is fraudulent under the UCL if it is likely to deceive consumers.

60.    Defendants' false advertising scheme constitutes a fraudulent business practice

WARREN TERZIAN LLP

because Defendants made representations about Lemme GLP-1 Daily that were false and misleading. Their statements are likely to deceive, and did deceive, Plaintiff and members of the proposed False Advertising Class.

Unlawful Business Practices

61.     A business practice is unlawful under the UCL if it violates any other law or regulation.

62.     Defendants engaged in unlawful business practices by violating the FAL.

63.     Defendants further engaged in unlawful business practices by violating sections 1770(a)(5), 1170(a)(7), and 1770(a)(9) of the Consumer Legal Remedies Act, by falsely representing that their supplement has characteristics and benefits that it does not have, is fit for its intended use, and is of a particular standard, quality, or grade.

64.     Defendants' unlawful, unfair, and fraudulent business practices have unjustly enriched Defendants at the expense of Plaintiff and members of the proposed False Advertising Class.

65.     Plaintiff and members of the proposed False Advertising Class are entitled under the UCL to restitution to the extent of Defendants' unjust enrichment as a result of the scheme, or such other amount as the Court may find equitable.

66.     Plaintiff and members of the proposed False Advertising Class are also entitled under the UCL to public injunctive relief enjoining Defendants' use of their unlawful, unfair, and fraudulent business practices in California in the future.

**SECOND CAUSE OF ACTION**

**False Advertising, Cal. Bus. & Prof. Code § 17500 *et seq.* against Defendants**

67.     Plaintiff realleges all of the allegations in prior paragraphs (except paragraphs 23–29).

68.     Plaintiff brings this claim individually, on behalf of the members of proposed Class, and on behalf of the general public against Defendants for violations of the FAL.

69.     The FAL makes it unlawful for a business that intends to sell a product to falsely advertise that product. Cal. Bus. & Prof. Code § 17500.

18

COMPLAINT

WARREN TERZIAN LLP

70. Defendants disseminated untrue and misleading advertisements to Plaintiff and members of the proposed False Advertising Class.

71. Defendants' false advertising was intended to induce reliance, and Plaintiff saw, heard, read, and reasonably relied on the statements in purchasing Lemme GLP-1 Daily. Classwide reliance may be inferred because a reasonable consumer would consider them important in deciding whether to buy the supplement.

72. Defendants' misrepresentations were a substantial factor in Plaintiff's purchase decision and the purchase decision of False Advertising Class members. Plaintiff and members of the proposed False Advertising Class would not have purchased Lemme GLP-1 Daily if they had known that Defendants had no clinical support for their claim that a 17% increase in GLP-1 would have an effect on "un-hunger" or weight loss.

73. Defendants' false advertising unjustly enriched Defendants at the expense of Plaintiff and members of the proposed False Advertising Class.

74. Plaintiff and members of the proposed False Advertising Class are entitled under the FAL to restitution to the extent of Defendants' unjust enrichment as a result of the scheme, or such other amount as the Court may find equitable.

75. Plaintiff and members of the proposed False Advertising Class are also entitled under the FAL to public injunctive relief enjoining Defendants' use of its false advertising scheme in California in the future.

### THIRD CAUSE OF ACTION

**Violation of Yelp Law, Cal. Civ. Code § 1670.8, against Defendants**

76. Plaintiff realleges all of the allegations in prior paragraphs (except paragraphs 53–75).

77. Defendants are in the business of selling consumer goods and services.

78. Plaintiff and Yelp Law Class members purchased goods from lemmelive.com.

79. When California consumers purchase supplements from lemmelive.com, Defendants attempt to bind them to contractual terms set forth in "terms of service." The terms of service provisions are part of a contract or proposed contract under section 1670.8(a).

19

WARREN
TERZIAN LLP

80. Among the terms of the contract or proposed contract are that purchasers may not post critical performance claims about Lemme products on Defendants' website: "Anything you post, upload, share, store, or otherwise provide or make available through the Services is your 'User Submission'. . . . You agree that you will not post, upload, share, store, or otherwise provide through the Services any User Submissions that . . . (ix) is [sic] a performance claim about any Lemme Products."

81. These terms violate the Yelp Law in that they aim to restrict the rights of California consumers to make critical claims about the performance of Defendants' products and services.

82. Online product reviews, when placed on the webpage of a product for sale, are critical to online retailers. These reviews, if positive, supply "social proof" for the company and its products. Social proof is a psychological phenomenon where people form opinions and make decisions based on other people's actions. "If you can get people who are similar to the person you're trying to persuade to speak on your behalf, it's a lot easier for you than if you have to try to hammer your message one more time into a reticent mind."[10] Social proof operates on the fundamental psychological principle that humans have an innate need for social validation. Among other things, social proof reduces uncertainty about potential purchases (e.g., if others loved the product, the prospective customer likely will too). Social proof also increases consumers' trust in the product and exploits the bandwagon effect (where people take actions like buying a product because they see others happy with their purchases).

83. Online reviews are the most sought-after type of social proof, as consumers rely on them for an honest and realistic impression of products. "Consumer reviews are trusted 12 times more than manufacturer product descriptions, and 92 percent of consumers feel hesitant when no customer reviews are featured on a brand's site."[11]

---

[10] Arizona State University, *The Gentle Science of Persuasion, Part Three: Social Proof*, https://news.wpcarey.asu.edu/20070103-gentle-science-persuasion-part-three-social-proof (Jan. 3, 2007).

[11] Akram Atallah, Inc., *The Impact of Social Proof: How to Leverage Psychology in Marketing* (Apr. 24, 2024), https://www.inc.com/inc-masters/the-impact-of-social-proof.html; *see also* S.A.N. Shazuli Ibrahim, *Impact of Online Reviews on Consumer Purchase Decisions in E-Commerce Platforms*, International Journal for

WARREN
TERZIAN LLP

84.    "[P]ositive testimonials increas[e] sales conversions by 82 percent," and "consumers are far more likely to engage with brands that have been positively endorsed by others . . . ."[12] By contrast, "negative reviews have a significant negative influence on consumer purchasing decisions" and usually "directly reduce[] their interest in purchasing a particular product."[13].

85.    On information and belief, Defendants include online ratings and reviews on their lemmelive.com product pages because they are exploiting social proof to increase sales and visibility of their products. Defendants actively seek online ratings and reviews. And Defendants organize customer reviews so that the most favorable reviews are shown first.

86.    Plaintiff and the Yelp Law Class members are entitled to civil penalties under Cal. Civ. Code § 1670.8 and public injunctive relief enjoining this illegal practice.

## PRAYER FOR RELIEF

Plaintiff, on behalf of herself and the members of the proposed Classes, requests that this Court award the following relief against Defendants:

a.    an order certifying the Classes and designating Plaintiff as class representative and her counsel as class counsel;

b.    restitution of all unjust enrichment that Defendants obtained from Plaintiff and the False Advertising Class members as a result of their unfair, unlawful, and fraudulent business practices and false advertising as described herein;

c.    public injunctive relief on behalf of the members of both Classes enjoining Defendants from continuing their schemes and illegal practices in California in the future;

---

Multidisciplinary Research, May–June 2023, at 5–6,  https://www.ijfmr.com/papers/2023/3/3687.pdf ("Higher volumes of reviews tend to create a perception of social proof and influence consumer attitudes and purchase decisions. . . . Online reviews play a pivotal role in shaping consumer purchase decisions in e-commerce platforms. They act as a powerful source of social proof, providing consumers with the confidence and reassurance necessary to navigate the vast online marketplace. The transparency, credibility, and influence of online reviews make them a vital consideration for businesses seeking to succeed in the competitive e-commerce industry.").

[12] *Id.*

[13] Rachmiani et al., *The Impact of Online Reviews and Ratings on Consumer Purchasing Decisions on E-commerce Platforms*, 4 International Journal of Management Science and Information Technology 504, 504, 512 (2024), https://lembagakita.org/journal/ index.php/IJMSIT/article/download/3373/2509.

WARREN
TERZIAN LLP

d.      civil penalties on behalf of Yelp Law Class members; and

e.      attorneys' fees and costs.

Dated: April 15, 2025

**WARREN TERZIAN LLP**

_____

Thomas D. Warren

*Counsel for Plaintiff and Proposed Class Counsel*

COMPLAINT

WARREN
TERZIAN LLP

## DEMAND FOR JURY TRIAL

Plaintiff Christina Robins demands a jury trial on all issues so triable.

Dated: April 15, 2025

**WARREN TERZIAN LLP**

Thomas D. Warren

*Counsel for Plaintiff and Proposed Class Counsel*